UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :

        - v. -                              :        **INFORMATION**

ROCHESTER DRUG CO-OPERATIVE, INC.,          :        19 Cr.

                Defendant.                  :

- - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: **APR 2 3 2019**

**19 CRIM 290**

### COUNT ONE
### (Narcotics Conspiracy)

The United States Attorney charges:

#### The Defendant

1.   At all times relevant to this Information, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, was a wholesale distributor of pharmaceutical products, including controlled substances, headquartered in Rochester, New York. At various times relevant to this Information, ROCHESTER DRUG CO-OPERATIVE, INC. was one of the nation's ten largest distributors of pharmaceutical products with over 1,300 pharmacy customers and over $1 billion in revenue per year.

#### Overview

2.   For at least half a decade, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, distributed dangerous, highly addictive opioids to pharmacy customers that it knew were being sold and used illicitly. Among other things, and at the direction of senior

JUDGE BUCHWALD

management, ROCHESTER DRUG CO-OPERATIVE, INC. supplied large quantities of oxycodone, fentanyl, and other dangerous opioids to pharmacy customers that its own compliance personnel determined were dispensing those drugs to individuals who had no legitimate medical need for them. The company's chief executive officer ("Executive-1") and other members of senior management directed the company to supply pharmacies they knew were dispensing controlled substances in contravention of the Controlled Substances Act ("CSA"), in order to maximize the company's revenues and the compensation of Executive-1.

3.    To perpetuate this scheme, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, acted in violation of the CSA and its own purported polices in an effort to conceal its illicit distribution of controlled substances from the Drug Enforcement Administration ("DEA") and other law enforcement authorities. Among other things, ROCHESTER DRUG CO-OPERATIVE, INC. made the deliberate decision not to investigate, monitor, and report to the DEA pharmacy customers that it knew were diverting controlled substances for illegitimate use. Because it knew that reporting these pharmacies would likely result in the DEA investigating and shutting down its customers, ROCHESTER DRUG CO-OPERATIVE, INC.'s senior management directed the company's compliance department not to report them, and instead to continue supplying those customers with dangerous controlled

2

substances that the company knew were being dispensed and used for illicit purposes.

### The Opioid Epidemic

4.    Over the past decade, the United States has seen a dramatic rise in the use and abuse of oxycodone and fentanyl, two highly addictive, narcotic-strength opioids.   These opioids are used to treat severe and chronic pain conditions, such as post-operative pain, serious back and orthopedic injuries, as well as pain associated with certain forms of cancer and other terminal illnesses.   Oxycodone, which is distributed as a pill, and fentanyl, which is distributed as a patch or spray, can only be obtained from pharmacies with a prescription written by a treating physician.

5.    Because of their highly addictive qualities, opioids such as oxycodone and fentanyl are frequently abused, which abuse can lead to opioid dependence, addiction, and the use of illicit narcotics such as heroin.   For example, in 2016 -- *i.e.*, during the time period relevant to this Information -- approximately 2.1 million people in the United States suffered from substance abuse disorders related to prescription opioid pain relievers such as oxycodone and fentanyl.   In the same year, approximately one-quarter of patients who were prescribed opioids for chronic pain abused them, and approximately 80% of individuals who used heroin

3

first abused prescription opioids. Because they are highly addictive and available pursuant only to a prescription, oxycodone and fentanyl products have enormous cash value to drug dealers who sell oxycodone pills or fentanyl products to addicted individuals on the street for thousands of dollars.

### Responsibilities under the Federal Narcotics Laws

6. The CSA regulates the manufacturing, distribution, and use of substances that can have a detrimental effect on public health and welfare. See 21 U.S.C. § 801, et seq. Some of those controlled substances, including opioids such as oxycodone and fentanyl, may be manufactured, distributed, or used lawfully in accordance with the requirements and limitations of the CSA.

7. To distribute controlled substances like oxycodone and fentanyl, a company such as ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, must register with the DEA and comply with laws and regulations imposed by the CSA.

8. As a registered distributor, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, is required to maintain "effective control[s] against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. § 823(b)(1). As a registered distributor, ROCHESTER DRUG CO-OPERATIVE, INC. is also responsible for reporting suspicious orders to the DEA, which are defined by

4

regulation as including "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b).

9. Throughout the time period relevant to this Information, the DEA was responsible for enforcing the CSA and its implementing regulations including by, among other things, approving distributors' registrations, conducting audits and inspections, reviewing sales data and suspicious order reports, and bringing enforcement actions against registrants who failed to comply with the CSA.

10. At various times relevant to this Information, and as required by the CSA and its implementing regulations, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, promulgated policies purported to control against diversion of controlled substances and report suspicious orders to the DEA. ROCHESTER DRUG CO-OPERATIVE, INC. informed the DEA of these policies and, from time to time, provided copies of those policies to the DEA.

11. At various times relevant to this Information, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, also notified its customers that it was required to report suspicious orders for controlled substances to the DEA, and that it would not ship orders that were deemed suspicious.

The Company's Unlawful Distribution of Controlled Substances

12. Between in or about 2012 and in or about March 2017, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, violated the federal narcotics laws by distributing to its pharmacy customers controlled substances - including dangerous opioids such as oxycodone and fentanyl - that the company knew were being sold and used illicitly. The company did so to, among other things, maximize the company's revenues and the compensation of Executive-1.

13. Specifically, many pharmacy customers of ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, displayed the "red flags" that, according to the company's own policies, "indicate that a pharmacy may be dispensing controlled substances for other than legitimate medical purposes" to individuals who were diverting or abusing the substances. These "red flags" included, among other things, pharmacies that were "[d]ispensing highly-abused controlled substances" in large quantities, purchasing "only controlled substances and little else," "[d]ispensing quantities consistently higher than accepted medical standards," "[a]ccepting a high percentage of cash from patients," "[d]ispensing to out-of-area or out-of-state patients," and "[f]illing controlled substance

6

prescriptions issued by practitioners acting outside the scope of their medical practice or specialty."

14.    Throughout the relevant time period, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, dispensed controlled substances to customers that its own compliance department had concluded displayed these "red flags" and others. The compliance department repeatedly reported to senior management -- including Executive-1 -- that many of its largest customers were dispensing controlled substances that were being diverted.    Nonetheless, Executive-1 directed the compliance department and sales personnel to continue supplying these pharmacies with oxycodone, fentanyl, and other controlled substances.

15.    In almost every case, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, continued to distribute controlled substances to the pharmacies it identified as displaying "red flags" of diversion even after becoming aware of these problems.    In fact, in many cases, the company continued to distribute controlled substances to problematic customers for years after learning of the "red flags" associated with the pharmacy, and often only terminated their business with those customers after learning that the customer - or ROCHESTER DRUG CO-OPERATIVE, INC. itself - was under DEA investigation.

7

16.   For   example,   at   various   times   relevant   to   this
Information, the compliance and sales staff at ROCHESTER DRUG CO-
OPERATIVE,   INC.,   the   defendant,   repeatedly   informed   senior
management that they were troubled by the large quantities of
controlled substances being purchased by some of the company's
customers.   In 2013, for instance, the company's head of sales
observed to Executive-1, the company's chief operating officer
("Executive-2"), and the chief compliance officer (the "Compliance
Officer") that "we have some VERY suspicious customers due to their
buying" of large quantities of controlled substances.   On another
occasion, one of the company's compliance auditors told Executive-
2 and the Compliance Officer that some pharmacies' "very high"
controlled substance dispensing averages were "like a stick of
dynamite waiting for [the] DEA to light the fuse."   In both cases,
the company continued to supply the customers with controlled
substances and did not report the pharmacies to the DEA.

17.   Similarly, the Compliance Officer and other employees in
the   compliance   department   repeatedly   noted,   including   to
Executive-1 and Executive-2, that their customers were filling
prescriptions written by doctors that were under DEA investigation
or had been indicted.   For instance, a member of the compliance
staff noted to the Compliance Officer and others that a pharmacy
was   filling   prescriptions   written   by   multiple   doctors   on   the

company's "watch list," and the prescribers themselves were "a large concern of RED FLAG diversion."

18. ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, also supplied pharmacies that it knew were dispensing controlled substances to patients traveling to the pharmacies from out-of-state and who were paying for controlled substances in cash, both of which are red flags that the patients using those controlled substances had no legitimate medical need for them. For instance, in 2012, the company began supplying a pharmacy that admitted it did not do any due diligence on its opioid prescriptions. That pharmacy previously had a customer die of a drug overdose. By 2014, the company observed that over sixty percent of the prescriptions filled by the pharmacy were paid for in cash and nearly all cash-paying patients were traveling to the pharmacy from out of state. One of ROCHESTER DRUG CO-OPERATIVE, INC.'s compliance auditors described the pharmacy as a "DEA investigation in the making," to which Executive-1 commented, "I don't think this is going to end well." Nonetheless, ROCHESTER DRUG CO-OPERATIVE, INC. continued to supply the pharmacy with controlled substances for another four years, and did not stop supplying the pharmacy until 2018, after the DEA began its criminal investigation of ROCHESTER DRUG CO-OPERATIVE, INC.

9

19. The continued distribution of controlled substances by ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, to these customers that it knew were dispensing the narcotics for illicit purposes was directed by the company's senior management, including Executive-1, despite a clear understanding by the company's senior management that the pharmacies' dispensing practices were in contravention of the CSA. In fact, in 2014, a compliance consultant instructed the company's senior management, including Executive-1 and Executive-2, that "[a]s a distributor, [the company] need[ed] to comply with the DEA 'Know-Your-Customer' Due Diligence policy" and warned that the company would be placed in the DEA's "cross-hairs . . . because of [its] willful blindness and deliberate ignorance." Later that year, the company's outside legal counsel noted that ROCHESTER DRUG CO-OPERATIVE had over one hundred pharmacy customers that required additional due diligence to ensure they were dispensing controlled substances in compliance with the law. Nonetheless, the company largely ignored these warnings and continued to distribute controlled substances to customers that were illegitimately dispensing those narcotics.

## Statutory Allegation

20. From at least in or about January 2012, up to and including in or about March 2017, in the Southern District of New York and elsewhere, ROCHESTER DRUG CO-OPERATIVE, INC., the

10

defendant, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

21. It was a part and an object of the conspiracy that ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, and others known and unknown, would and did distribute and possess with intent to distribute controlled substances, outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. § 841(a)(1).

22. The controlled substances that ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, and others known and unknown, conspired to distribute and possess with intent to distribute were (i) a quantity of mixtures and substances containing a detectable amount of oxycodone, in violation of 21 U.S.C. § 841(b)(1)(C), and (ii) 400 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of 21 U.S.C. § 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

11

## COUNT TWO
### (Conspiracy to Defraud the United States)

The United States Attorney further charges:

23. The allegations contained in paragraphs 1 through 22 of this Information are repeated and realleged as if fully set forth herein.

### The Scheme to Defraud the DEA

24. Between in or about 2012 and in or about March 2017, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, sought to obstruct and hinder DEA oversight of the company's practices in order to prevent the DEA's enforcement of the narcotics laws against ROCHESTER DRUG CO-OPERATIVE, INC. and its customers. Despite the statutory and regulatory requirements that ROCHESTER DRUG CO-OPERATIVE, INC. guard against diversion and report suspicious orders to the DEA, ROCHESTER DRUG CO-OPERATIVE, INC. made material misrepresentations to the DEA about its due diligence practices and controls against diversion, and did not report thousands of suspicious orders from its customers to the DEA.

25. In order for the DEA to properly oversee the distribution of controlled substances and carry out its mandate under the CSA and implementing regulations, distributors -- such as ROCHESTER DRUG CO-OPERATIVE, INC., the defendant -- are required to monitor their customers by investigating suspicious activity and reporting such activity to the DEA. Beginning in or about 2007, the DEA

12

notified ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, in writing that it was required by law to maintain a program to guard against diversion of controlled substances by its customers, and needed to report to the DEA those orders and customers that appeared suspicious.

26. ROCHESTER DRUG CO-OPERATIVE, INC., the ' defendant, created standard operating procedures for the detection and reporting of diversion of controlled substances because it was required to do so by law. Specifically, in response to that directive, on multiple occasions during the relevant time period, ROCHESTER DRUG CO-OPERATIVE, INC. represented to the DEA that it had standard operating procedures for conducting due diligence on new customer accounts and reporting suspicious orders to the DEA. On multiple occasions, including during DEA audits and in connection with ROCHESTER DRUG CO-OPERATIVE, INC.'s application for a license to operate a new facility in Fairfield, New Jersey, the company provided the DEA with copies of its due diligence and suspicious order reporting standard operating procedures. Among other things, ROCHESTER DRUG CO-OPERATIVE, INC.'s standard operating procedures relating to customer due diligence represented that it would conduct due diligence on new customer accounts prior to selling new customers controlled substances. In addition, the company's standard operating procedures relating to

13

suspicious order reporting represented that the company would report orders in a manner consistent with the DEA's regulations.

27. Despite these representations to the DEA, as well as the statutory and regulatory obligations on distributors of controlled substances, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, acted in direct contravention of, among other things, the policies that the company shared with the DEA and represented it followed. It did so at the explicit direction of senior management -- including Executive-1, Executive-2, and the Compliance Officer -- and in order to continue doing business with customers it knew were likely diverting controlled substances.

### Misrepresentations About the Company's Due Diligence

28. First, despite the statutory obligation that ROCHESTER DRUG CO-OPERATIVE, the defendant, maintain effective controls against diversion, and the company's specific representations to the DEA that it would conduct due diligence on new customer accounts before opening them by, among other things, reviewing multiple months' worth of controlled substance dispensing data, the company opened multiple new accounts without conducting any due diligence. ROCHESTER DRUG CO-OPERATIVE, INC. acted in this manner, notwithstanding its representations, at the direction of its senior management, and in particular Executive-1 and Executive-2. For example, in or about July 2015, in response to

14

delays in new account openings, Executive-1 began pushing to open new accounts immediately, without conducting due diligence, and remarked that even though he had "no idea if this [new pharmacy customer] is a good guy or bad guy . . . it is taking too long [to open the account] no matter what the problem is." Executive-1 added in a subsequent email, "I know we have to do due diligence but we have the tail wagging the dog . . . this HAS to stop . . . Good or bad."

29. Consistent with Executive-1's directive, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, opened multiple new customer accounts without conducting due diligence in advance of making sales of controlled substances. Many of these new customers, however, had dispensing practices indicating that they were unlawfully distributing controlled substances. Indeed, as the Compliance Officer noted to other members of the compliance department, "all the new stores we are bringing on have baggage." That was, according to what another compliance department employee had heard, at least in part, because "everyone is being cut off by [other distributors] and running over to RDC . . . we are picking up rejects from other distributors." And in multiple cases, after opening new customer accounts without conducting due diligence and selling controlled substances for months, ROCHESTER DRUG CO-OPERATIVE, INC. discovered significant problems in the dispensing

15

records for those customers -- including high dosage opioid prescriptions and accepting a high percentage of cash from patients -- that suggested the pharmacies were unlawfully distributing controlled substances.

30. ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, intended to defraud the DEA with respect to its account 'opening due diligence procedure. Specifically, the decision to open new accounts without conducting due diligence, in contravention of the company's representations to the DEA, was motivated, at least in part, by a perception by the company's senior management that it could avoid DEA oversight because of changing 'enforcement priorities. In or about June 2016, Executive-1 told Executive-2 and the Compliance Officer that "[b]ased on recent government changed [sic] I want to accelerate. our account opening process. As soon as our credit managers completely approve our credit app we will open an account right away." Executive-1 justified the change in the company's practice based on his perception that "the government has recently told the DEA to lay off wholesalers."

31. Additionally, in response to Executive-1's directive that the company open new accounts without conducting due diligence, the Compliance Officer reminded Executive-1 and Executive-2 that the company's standard operating procedure that it provided to the DEA "states that RDC will conduct a review prior

16

to opening [a customer] to controls," and suggested that that any change to the company's policy "be documented so we may show DEA." But in order to conceal its change in practice, the company did not amend its written policies or notify the DEA, and instead opened accounts without conducting due diligence into the new customers' ordering and prescribing practices. Compliance employees subsequently determined that some of those customers displayed "red flags" of diversion of controlled substances.

## Willful Failure to File Suspicious Order Reports

32. Second, in furtherance of its scheme to defraud the DEA, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, knowingly and willfully avoided filing suspicious order reports with the DEA. The company did not report suspicious orders in order to protect the profit being generated by customers dispensing large quantities of controlled substances. Indeed, at the direction of the company's senior management, including Exective-1 and Executive-2, the Compliance Officer instructed compliance department employees by email that "we do not turn in a store" merely based on suspicions of wrongdoing by the customer, but rather choose "to educate and work with our customers."

33. Rather than reporting suspicious orders, the compliance department of ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, undertook to prevent the reporting of suspicious orders. During

17

the relevant time period, the company maintained an automated "order of interest" program, which flagged customer orders for controlled substances that exceeded a customer's pre-established limits based on past order size.  ROCHESTER DRUG CO-OPERATIVE, INC. represented to the DEA that it used this system to identify suspicious orders.  But, in fact, the company willfully avoided filing suspicious order reports.  For example, the compliance department staff were instructed to mark flagged orders "not suspicious" and release orders to pharmacies without reviewing the pharmacies' dispensing data.  Additionally, in order to prevent the generation of future "orders of interest," and therefore avoid reporting suspicious orders to the DEA, the company's compliance department regularly increased the threshold limit of controlled substances a pharmacy could purchase from ROCHESTER DRUG CO-OPERATIVE, INC. The company knew that such a practice was contrary to law.  For example, in 2012, following a conference hosted by the DEA, a ROCHESTER DRUG CO-OPERATIVE, INC. employee told Executive-1, Executive-2, and the Compliance Officer that the DEA has stated that "if we currently have stores that are constantly hitting our suspicious order report [threshold] . . . we cannot just simply cut them back, on the drug that is causing the alert. . . . by cutting them back, we are telling the account[] [t]hat a

18

little bit of Diversion, is okay." Nonetheless, throughout the relevant time period, the company did just that.

34. Indeed, in some instances, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, at the direction of senior management, also eliminated customers' controlled substance order limit thresholds from the company's automated system entirely. For example, in March 2013, when ROCHESTER DRUG CO-OPERATIVE, INC.'s largest customer exceeded its order limit for oxycodone, the Compliance Officer wrote to Executive-1 and Executive-2 that while "[t]echnically by our [standard operating procedure] we should make a call and stop selling," the company continued to supply controlled substances to the customer.

35. Even after ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, terminated pharmacy customers for failing to comply with the CSA, the company did not report those customers to the DEA.

36. Despite its obligations under the CSA and its representations in its own policies and to the DEA, during the relevant time period, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, only filed four suspicious order reports with the DEA. During the same period, however, the company should have reported hundreds of suspicious orders to the DEA, including orders associated with customers that the company's compliance department

19

determined had "red flags," or customers that were terminated, but it instead knowingly and willfully failed to do so.

## Statutory Allegation

37. From at least in or about January 2012, up to and including in or about March 2017, in the Southern District of New York and elsewhere, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to defraud the United States and an agency thereof, to wit, the DEA, in violation of Title 18, United States Code, Section 371.

38. It was a part and an object of the conspiracy that ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, and others known and unknown, willfully and knowingly, using deceit, craft, trickery, and dishonest means, would and did defraud the United States and an agency thereof, to wit, the DEA, by willfully failing to report suspicious orders of controlled substances to the DEA and advise the DEA of customers diverting controlled substances, thereby impeding, impairing, defeating and obstructing the lawful function of the agency, in violation of Title 18, United States Code, Section 371.

20

## Overt Acts

39.    In furtherance of the conspiracy and to effect its illegal objects, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, and its co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    During the relevant time period, ROCHESTER DRUG CO-OPERATIVE, INC. received over 8,000 "orders of interest," including at least 412 flagged orders of fentanyl and 2,530 flagged orders of oxycodone, from its pharmacy customers. During that time period, however, ROCHESTER DRUG CO-OPERATIVE, INC. reported only four suspicious orders to the DEA.

b.    During the relevant time period, ROCHESTER DRUG CO-OPERATIVE, INC. opened new customer accounts for customers located in the Southern District of New York and elsewhere, and sold those customers controlled substances, without conducting due diligence on the customers, as ROCHESTER DRUG CO-OPERATIVE, INC. had represented to the DEA that it would do.

c.    During the relevant time period, ROCHESTER DRUG CO-OPERATIVE, INC. supplied customers located in the Southern District of New York and elsewhere with controlled substances, despite knowing that those controlled substances were being distributed outside the scope of professional practice and not for a legitimate medical purpose, and failed to report those customers

21

to the DEA.

(Title 18, United States Code, Section 371.)

## COUNT THREE
### (Failure to File Suspicious Order Reports)

The United States Attorney further charges:

40. The allegations contained in paragraphs 1 through 36 of this Information are repeated and realleged as if fully set forth herein.

41. From at least in or about January 2012, up to and including in or about March 2017, in the Southern District of New York and elsewhere, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, knowingly failed to make, keep, and furnish a record, report, notification, declaration, order and order form, statement, invoice, and information required by the Controlled Substances Act and its implementing regulations, to wit, ROCHESTER DRUG CO-OPERATIVE, INC. knowingly failed to disclose suspicious orders of controlled substances to the DEA, in violation of Title 21, United States Code, Sections 842(a)(5) and (c)(2)(A).

(Title 21, United States Code, Sections 842(a)(5) and (c)(2)(A).)

### FORFEITURE ALLEGATION

42. As a result of committing the offense alleged in Count One of this Information, ROCHESTER DRUG CO-OPERATIVE, INC., the defendant, shall forfeit to the United States pursuant to Title

21, United States Code, Section 853, any and all property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of said offense and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense that the defendant personally obtained.

## Substitute Asset Provision

43.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant: (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be divided without difficulty; it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 21, United States Code, Section 853.)

GEOFFREY S. BERMAN
United States Attorney

23

Form No. USA-33s-274 (Ed. 9-25-58)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**v.**

**ROCHESTER DRUG CO-OPERATIVE, INC.,**

**Defendant.**

**INFORMATION**

19 Cr.

(18 U.S.C. 371;
21 U.S.C. §§ 842 and 846)

GEOFFREY S. BERMAN
United States Attorney